Crum-Brainard Co., Ltd. v. Commissioner.
Crum-Brainard Co. v. Commissioner
Docket No. 11444.
United States Tax Court
1951 Tax Ct. Memo LEXIS 360; 10 T.C.M. (CCH) 36; T.C.M. (RIA) 51015; January 12, 1951
Robert S. Thompson, Esq., for the petitioner. R. E. Maiden, Esq., for the respondent. RAUM
Memorandum Findings of Fact and Opinion The respondent disallowed a claim for refund of excess profits tax filed by the petitioner for the taxable year 1943 in the amount of $ 44,376.26. The petitioner filed a petition with this Court, as permitted by the provisions of Section 732 of the Internal Revenue Code, contesting the disallowance. The statutory notice of disallowance of petitioner's claim for refund also determined a deficiency in excess profits tax for the taxable year 1943, but this deficiency is not in issue. The sole question presented is whether the petitioner is entitled to any adjustments to its base period net income pursuant to the provisions of Section 711 (b) (1) (J) (ii) of the Internal Revenue Code *361 . In its petition the petitioner alleged that certain deductions representing royalties paid by it in the years 1936, 1937 and 1938, commissions paid to salesmen in the years 1936 and 1937, and discounts given by it in the year 1936, be disallowed. The petitioner now concedes the correctness of the respondent's refusal to disallow deductions taken in the years 1936 and 1937 for commissions paid to salesmen in those years. Findings of Fact The facts were stipulated in part and as thus stipulated are hereby found. The petitioner was at all times mentioned herein a corporation duly organized and existing under the laws of the State of California. On or about December 7, 1944, all of the stock was purchased by the Security Engineering Co., Inc. In March of the year 1945 its name was changed to Security Rock Bit Mfg. Co., and on or about October 31, 1945, it was dissolved pursuant to the laws of the State of California. Petitioner's authority to bring this action, notwithstanding its prior dissolution, is based on Section 5400 of the California Corporation Code (formerly California Civil Code Section 399). During its entire existence, including the taxable year 1943, petitioner *362 filed its income and excess profits tax returns with the collector of internal revenue for the sixth district of California. Its income and excess profits tax returns for the calendar year 1943 disclosed an income and declared value excess profits tax liability of $ 44,364.42 and an excess profits tax liability of $ 214,599.40, which taxes were paid by it. Petitioner's books and records were kept on a calendar year and accrual basis, and its returns were filed on the same basis. Petitioner was at all times pertinent herein entitled to use the income method, as provided by Section 713 of the Internal Revenue Code, in determining its excess profits tax credit. On April 10, 1945, petitioner filed a claim for refund (Form 843) of excess profits taxes for the taxable year 1943. That claim for refund was based upon petitioner's contention that the deductions here in issue should be disallowed thus increasing petitioner's credit for excess profits tax. On April 4, 1946, the Commissioner by registered mail duly notified the petitioner of disallowance of its claim for refund. During the years 1931 to 1942, inclusive, the shares of stock in the petitioner were *363 owned as follows: 1931
1938
to
to
1935,
1942,
incl.
1936
1937
incl.
R. R. Crum and Mil-
dred Crum, joint
tenants
152
258
322 1/2
332 1/2
F. W. Brainard and
Ruth Brainard,
joint tenants
25
104
130
130
E. A. Perkins and
Maude Perkins,
joint tenants
1
90
112 1/2
112 1/2
Robert Bromberg
5
8
10
10
O. L. Mills
100
160
160
160 During the year 1943, R. R. Crum owned 389 1/2 shares; F. W. Brainard 130 shares; E. A. Perkins 55 1/2 shares, and O. L. Mills 200 shares. The only stockholder who was a substantial creditor of petitioner was O. L. Mills. Crum, Brainard and Perkins were officers of petitioner. The principal business of petitioner was the manufacture and sale of core bits and heads and roller rock bits used in the oil well drilling industry. Early in the year 1934, R. R. Crum developed a roller rock bit and made application to the United States Patent Office for letters patent thereon. The petitioner first commenced the manufacture and sale of the roller rock bit in that year. The bit was developed and owned by Crum personally. On May 18, 1934, R. R. Crum assigned by an instrument in writing *364 a 1/4 interest in the patent application and any patent that might issue pursuant thereto to Edwin A. Perkins and a 3/8 interest therein to Frank W. Brainard. The petitioner had been in debt almost from its inception. In 1932, it was placed in the hands of a receiver. In 1933, the receivership was dissolved, and thereupon the creditors of the petitioner, functioning through a creditors' committee, exercised control over the management of the petitioner including control of purchases, general sales policies, disbursements of any monies, and withdrawals by corporate officers including Crum. The creditors' committee met with the corporate officers once a month or oftener if there was a problem requiring decision, and Crum, as president of petitioner, reported every move to the committee. It had the right to veto or concur in Crum's actions. It continued to function until 1937, at which time all the debts of the company had been satisfied. At the time of the development of the roller rock bit, petitioner was in very poor financial circumstances, and it was subject to control by the creditors' committee. The development of the roller rock bit by Crum was communicated by him to the committee. *365 At that time he told the committee that he had confidence that the sale of the bit by the petitioner could eventually save it financially, but that in view of the then precarious financial condition of petitioner, he would allow it to sell the bit only on a royalty basis. The creditors' committee subsequently approved the execution of a Memorandum Agreement on February 1, 1935, providing for salaries to be paid to Perkins, Brainard and Crum, and, in addition, for royalties to be paid to them for the use and sale of the roller rock bit computed as follows: Fifteen per cent (15%) of gross sales of roller rock bits in excess of $ 7,500 in any one month. On June 26, 1936, the Memorandum Agreement of February 1, 1935, was replaced by a written contract giving to petitioner the exclusive right and privilege to use the patent or patent rights pertaining to the roller rock bit for a period of three years beginning July 1, 1936. The contract of June 26, 1936, provided also that the petitioner should pay to Crum, Brainard and Perkins a royalty of 10 per cent (10%) of all "gross income" derived by petitioner from the sale or rental of the roller rock bits. The agreements of February 1, 1935, and *366 June 26, 1936, were presented to the creditors' committee on the basis that, if those agreements were accepted, the petitioner would have the right to sell the roller rock bit and, if not accepted, the petitioner would not have such right and a new company would be formed by Crum, Brainard and Perkins to sell the roller rock bit. The said agreements were approved by the creditors' committee prior to their execution. In 1934 there was a lack of understanding between petitioner's stockholder-managers and the creditors' committee. The major creditors had one viewpoint but the minor creditors were more anxious to receive immediate settlement of their claims and were inclined to believe that the company should be liquidated. Crum, Brainard and Perkins were uncertain whether petitioner could be saved and what salaries the creditors' committee would permit them to draw, since certain of the creditors considered that they (Crum, Brainard and Perkins) should work for nothing until the creditors' claims had been satisfied. Crum, Brainard and Perkins, therefore, insisted upon being paid royalties for the use of the patent rights to the roller rock bits. The royalties were paid in addition *367 to salaries and were not considered as salaries but were payments with respect to sales of the bit. The petitioner was allowed to sell the bits without payment of royalty until February 1, 1935, for the reason that the acceptability, patentability or useful value of the bits were unknown until that date. Royalties were paid by petitioner to Crum, Brainard and Perkins pursuant to the terms of the memorandum of February 1, 1935, and the agreement of June 26, 1936, in the following amounts and for the following years: Year
Royalties Paid
1935
$ 14,838.17
1936
33,816.83
1937
61,659.14
1938
54,239.76
1939
23,766.97
Petitioner paid no royalties on roller rock bits manufactured and sold by it in 1934 or after June 30, 1939, the termination date of the agreement of June 26, 1936. Royalties for the manufacture, use or sale of other devices were paid in the following amounts and for the following years: Year
Royalties Paid
1931
$ 38.19
1932
24.24
1933 to 1943, incl.
None
Prior to the year 1934 the petitioner manufactured and sold core bits. The core bit was an oil tool used in the drilling of an oil well to cut into the earth to obtain *368 a sample of core in the process. In the year 1934 the petitioner commenced the manufacture and sale of the roller rock bit developed by Crum. The roller rock bit was not used to obtain samples; it was an oil tool used in drilling an oil well to cut into the earth. It differed from the core bit manufactured and sold by petitioner principally in that it employed roller type cutters while the core bit used blade type cutters. The theoretical basic engineering principle of both bits was the same, however, in that both accomplished their cutting function by a dragging motion. The roller rock bit was considered an oil tool in addition to the core bit previously manufactured and could be used in the same drilling operation together with the core bit. In function the roller rock bit manufactured and sold by petitioner did not secure a core and differed also in that the roller cutters are of greater durability than the blade cutters and sometimes are more suitable to drill harder formation. The major producers in the oil tool industry manufacture both a core bit and a non-core bit. Prior to the year 1935 petitioner gave to its customers a discount of 2 per cent for payment on the tenth *369 day of the month following the month of invoice. In the latter part of 1934, or the early part of 1935, the petitioner commenced the practice of allowing a special 5 per cent discount for payment within ten days of receipt of invoice. The 5 per cent discounts were not given to certain of the smaller customers. The practice of granting the special 5 per cent discounts was discontinued in January of 1937. Discounts taken as deductions by petitioner were given in the following amounts for the following years. Year
Discounts
1930
$ 81.97
1931
679.54
1932
795.55
1933
318.81
1934
$ 1,390.35
1935
8,862.26
1936
14,034.18
1937
11,863.75
1938
9,569.91
1939
8,723.38
1943
8,492.08
The discounts so given represented the total of all discounts both at 5 per cent and at 2 per cent. The special 5 per cent discounts were given to obtain working capital to meet the financial difficulties of petitioner. The increase in rate from 2 per cent to 5 per cent was made with the agreement of the creditors' committee. The discounts were not connected in any way with any other deduction. Petitioner's sales, cost of goods sold, and gross income were as follows: *370 Year
Sales
Cost of Goods Sold
Gross Income
1930
$ 22,506.39
$ 10,573.87
$ 11,932.52
1931
41,749.84
12,841.57
28,908.27
1932
18,125.74
7,203.54
10,922.20
1933
24,607.29
10,352.56
14,254.73
1934
62,783.05
32,836.22
29,946.83
1935
209,682.71
101,532.51
108,150.20
1936
340,504.79
167,687.90
172,816.89
1937
621,570.96
319,633.80
301,937.16
1938
543,267.39
289,787.27
253,480.12
1939
549,813.68
278,853.03
270,960.65
1943
1,090,419.93
538,906.27
551,513.66
Petitioner's sales from the various segments of its business were as follows: Miscellaneous
Core Bits
Roller
Year
Total
Sales n(a)
and Heads
Bits
1930
$ 22,506.39
$ 384.01
$ 22,122.38
1931
41,749.84
None
41,749.84
1932
18,125.74
786.67
17,339.07
1933
24,607.29
1,093.00
23,514.29
1934
62,783.05
5,341.35
32,409.70
$ 25,032.00
1935
209,682.71
873.43
12,503.75
196,305.53
1936
340,504.79
2,278.10
1,723.04
336,503.65
1937
621,570.96
2,181.87
None
619,389.09
1938
543,267.39
1,389.66
None
541,877.73
1939
549,813.68
8,039.18
4,794.25
n(b) 536,980.25
1943
1,090,419.93
502,559.68
None
587,860.25
*371 n(a) Miscellaneous sales as used herein include drill bits, bodies, breakers, reamers, salvage, etc., and defense contracts. n(b) Sales to June 30, 1939 (the termination date of the written royalty contract) were $ 237,737.66. The deduction taken by petitioner on its returns for the years 1936 to 1939, inclusive, as royalties and discounts, were abnormal in amount under Section 711 (b) (1) (J) (ii) of the Internal Revenue Code as follows, to-wit: Year
Royalties
Discounts
1936
$ 29,172.23
$ 10,482.10
1937
46,454.45
1938
19,766.58
Opinion RAUM, Judge: This case involves the application of Section 711 (b) (1) (k) (ii) of the Internal Revenue Code. Petitioner elected to use the average earnings method in computing its excess profits credit, and it seeks to increase the size of the credit by eliminating certain deductions for royalties and discounts which had been allowed to it during the base years. The general authority for such adjustments is found in Section 711 (b) (1) (J), which provides in substance that, in computing the excess profits credit, deductions in the base period shall be "disallowed", (i) if they belong to a class that is abnormal to the taxpayer, or (ii) if they are abnormal in amount, according to a specified formula. The parties have stipulated that the royalty deductions taken by petitioner on its returns were abnormal in amount under Section 711 (b) (1) (J) (ii) to the extent of $ 29,172.23 for 1936, $ 46,454.45 for 1937, and $ 19,766.58 for 1938, and that the deduction for discounts was abnormal under those provisions to the extent of $ 10,482.10 for 1936. However, mere abnormality is not a sufficient reason for the desired adjustment. Section 711 (b) (1) (k) (ii)[1] provides that the taxpayer must go further and establish "that the abnormality or excess is not a consequence of an increase in the gross income of the taxpayer in its base period" or of certain other enumerated factors. This case therefore turns upon whether petitioner has discharged the burden cast upon it by Section 711 (b) (1) (K) (ii). Cf. William Leveen Corporation, 3 T.C. 593, 595. *372 We are satisfied that, as to the royalty deductions, petitioner has failed to establish that the excess amounts were not a consequence of the increase in its gross income during the base period. To the contrary, it affirmatively appears on this record that the excess was a consequence of an increase in petitioner's gross income. Prior to 1934, petitioner's gross sales averaged some $ 26,000 a year. The year 1934 was a transition period *373 when it began to manufacture and sell the roller bit which had been developed by Crum. Its total sales in that year rose to $ 62,783.05, which included $ 25,032 sales of roller bits In 1935 the sales of roller bits gathered momentum and accounted for $ 196,305.53 out of a total of $ 209,682.71 for all sales. The dramatic increase continued during the next few years. In 1936 sales of roller bits rose to $ 336,503.65 out of a total of $ 340,504.79 for all sales; and in 1937 sales of roller bits leaped to $ 619,389.09 out of a total of $ 621,570.96 for all sales. In 1938 roller bit sales accounted for $ 541,877.73 out of a total of $ 543,267.39 for all sales. Meanwhile, petitioner's gross income was keeping pace with its sales. Its gross income of $ 14,254.73 in 1933 rose to $ 29,946.83 in 1943, to $ 108,150.20 in 1935, to $ 172,816.89 in 1936, to $ 301,937.16 in 1937, and fell in 1938 to $ 270,960.65 concomitantly with a drop in gross sales for that year. The royalties in question were paid only with respect to the roller bits. No such royalties were paid in 1934, but during the following years the royalties amounted to $ 14,838.17 in 1935, $ 33,816.83 in 1936, $ 61,659.14 in 1937, and $ 54,239.76 in *374 1938. It is inescapable that these royalty payments closely paralleled and were directly attributable to the sales of roller bits and the resulting increases in gross income during the base period. And to the extent that such royalties were abnormal in amount they were "a consequence of an increase in the gross income of the taxpayer in its base period". Petitioner, however, asserts that the royalty deductions in question were not a consequence of an increase in gross income but that they "were the consequence of the demand of Petitioner's officers that royalties be paid as a condition precedent to the use by the Petitioner of their personal development, that demand in turn being occasioned by the precarious financial circumstances of Petitioner." We think that petitioner's position is unsound. Of course, Crum and his associates, in view of petitioner's precarious financial condition, demanded a royalty arrangement as a condition to turning over the roller bit to petitioner for manufacture and sale. Similarly, any stranger in the normal course of events would undoubtedly have demanded a royalty or some other consideration before making his invention available for exploitation, whether *375 or not the licensee were in precarious financial condition. Surely, royalties paid in such circumstances would not be "a consequence" of the patent owner's demand; rather, they would be a consequence of the sales of the product and gross income derived therefrom. The fact that Crum and his associates were the principal stockholders in petitioner explains why they were willing to give petitioner a license without obligation for royalties when petitioner was no longer under the control of the creditors' committee; and petitioner's financial involvement in 1935 and 1936 explains why they insisted on a royalty arrangement at that time. But petitioner's financial difficulties merely furnished the reason for their insistence upon a royalty agreement, which would have been a normal arrangement in any event. There is no suggestion whatever that the royalty rate was excessive. The demand by Crum and his associates was a circumstance in the chain of events leading up to the payment of royalties, but it in no way detracts from the basic conclusion that the royalties in question were a consequence of petitioner's increase in gross income within the meaning of Section 711 (b) (1) (K) (ii). In any *376 event, it is clear to us that petitioner has failed to establish, as required by the statute, that the amounts in question were not a consequence of an increase in its gross income in the base period. A different result is required in connection with the discount deduction. We think that petitioner has established that the abnormality was a consequence of a change in the rate of discount from 2 per cent to 5 per cent as a result of its need for working capital, and was not a consequence of any of the factors enumerated in Section 711 (b) (1) (K) (ii). The abnormality in amount of discount deductions occurred only in 1936. Petitioner had been in poor financial condition for some time, and was in need of working capital. It had been its practice to give its customers a 2 per cent discount for payment on the tenth day of the month following the month of invoice. In order to encourage prompt payment and thereby strengthen its cash position, it undertook to make the discount more attractive. Beginning in the latter part of 1934 or the early part of 1935, it offered customers, except certain smaller customers, a 5 per cent discount for payment within ten days of receipt of invoice. It *377 discontinued the special 5 per cent discount in January 1937. We are satisfied that the abnormality in the discount deduction for 1936 was a consequence of the increase in rate of discount. We think that petitioner has also satisfactorily established that the abnormality was not a consequence of any of the factors set forth in the statute. It was not a consequence of increase in gross income. True, there was some correlation between the discount generally and gross income over the years. But the abnormality in 1936 was not a consequence of increase in gross income within the meaning of the statute. The total amount of discount for 1936 was $ 14,034.18 and the gross income for that year was $ 172,816.89. On the other hand, in 1937 when the practice of giving the special 5 per cent discount was discontinued, the total amount of discount dropped to $ 11,863.75, although the gross income for that year rose to $ 301,937.16. The stipulated excess or abnormality for 1936 was not a consequence of increase in gross income. Nor was it a consequence of a change in the manner of operation or condition of petitioner's business. Respondent suggests that the taxpayer's pressing need for working capital *378 was a consequence of a change in the manner of operation or condition of its business, or that, in any event, petitioner has failed to carry its burden in this respect. We disagree. We think that petitioner has shown that its poor financial condition existed for a long period prior to the base years, and that its need for working capital, which induced the practice of granting the special 5 per cent discount, was not a consequence of any of the changes in its business set forth in the statute. Decision will be entered under Rule 50. Footnotes
1. The statutory provisions read as follows: SEC. 711. EXCESS PROFITS NET INCOME. * * *
(b) Taxable Years in Base Period. - (1) General Rule and Adjustments. - * * *
(K) Rules for Application of Subparagraphs (H), (I), and (J). - For the purposes of subparagraphs (H), (I), and (J) - * * *
(ii) Deductions shall not be disallowed under such subparagraphs unless the taxpayer establishes that the abnormality or excess is not a consequence of an increase in the gross income of the taxpayer in its base period or a decrease in the amount of some other deduction in its base period, and is not a consequence of a change at any time in the type, manner of operation, size, or condition of the business engaged in by the taxpayer.↩